————o————

## No. 7051.

## CHRISTIAN BACHER, JR., v. DR. LOUIS J. STUMPF.

### Syllabus.

1.  The word "poolroom", within the meaning of Act 128 of 1904, is a place maintained for carrying on or facilitating betting, but removed from or out of view of the game, contest or event upon which the wagers are laid; and it embraces betting not only on horse races but also on the result of baseball games.
2.  "The ordinary meaning of the words of the statute, Act 128 of 1904, construed together, unmistakably denounce as illicit the act of betting in poolrooms."

Appeal from the 28th Judicial District Court, Parish of Jefferson, Honorable John E. Fleury, Judge. Affirmed.

Edrington & Edrington and Joseph H. Brewer, for plaintiff and appellant.

F. A. Middleton, for defendant and appellee.

His Honor, EMILE GODCHAUX, rendered the opinion and decree of the Court, as follows:

367

This suit is upon two checks of defendant made to the order of and endorsed by plaintiff's brother, Charles Bacher, and payment of which was refused when presentment was made by plaintiff. The defense is failure or rather illegality of consideration, in that the checks were delivered to plaintiff's brother aforesaid as bets on baseball games which resulted adversely to defendant. This defense was sustained and the plaintiff has appealed.

The trial Court entertained no doubt, nor do we, that plaintiff is not a holder in due course of the checks, but is merely a party interposed for his brother, Charles Bacher; and that consequently the illegality of the consideration may be interposed as a bar to plaintiff's recovery.

The legality of the transaction must be judged in the light of Act 128 of 1904 as construed by the Supreme Court.

The statute declares that the operation of "poolrooms" is "gambling"; and a poolroom, according to a definition that has been cited with approval, is "a place where people bet or take chances."

<em>State v. Maloney,</em> 115 <em>La.,</em> 510.

Perhaps a more accurate definition, viewed from the standpoint of the evil sought to be remedied, is—a place maintained for carrying on or facilitating betting, but removed from or out of view of the game, contest or event upon which the wagers are laid.

<em>State v. Vaughan (Ark.),</em> 7 <em>L. R. A.,</em> 899<br>(<em>N. S.</em>)

The term would undoubtedly include betting not only on horse races but upon the result of baseball games.

Speaking of the statute the Supreme Court has said:

"The ordinary meaning of the words of the statute, construed together, unmistakably denounces

as illicit an act of betting in poolrooms." * *
* Legislation has placed its bar upon this species of gambling in words that none can misunderstand."

* * * "Gaming in poolrooms is prohibited by statutes not to be misunderstood."

*State v. Rabb*, 115 *La.*, 734.

There is no dispute that the checks were put by defendant in Charles Bacher's hands as a wager made with him on the result of baseball games, and further that these bets were made in what is termed in the evidence as a gambling house or poolroom where bets on baseball games are made, located in Royal street, that is, at a place far distant from and out of view of the baseball contests in question.

Christian and Charles Bacher were in constant attendance at this place and frequently accepted bets from defendant, with whom they had had no dealings except "gambling transactions", and the latter states that the two checks in controversy, aggregating $575.00, are "the remnants of about $5,000.00, that I lost to those two gentlemen" (plaintiff and his brother), with whom he played at this place "every day for two or three weeks", * *

* his play amounting "sometimes to $400 or $500 or $1,000 a day."

**Plaintiff testifies:**

Q. Now, you operate very extensively on baseball, Mr. Bacher, do you not; I mean you bet way up in the thousands?
A. No, sir.

Q. You and your brother conduct a sort of gambling business there together, do you not?
A. No, sir.

369

Q. What did you say—that you don't gamble extensively or that you don't gamble at all together?

A. We don't gamble together. When I bet I bet individually for myself personally.

Describing the place where the bets were made and the process, plaintiff says it is one of the "gambling baseball houses", "a pretty good-sized gambling house", and that "I bet and the other fellow bets me and we two agree on a bet. I don't call that any gambling house when you bet individual bets."

On this subject Charles Bacher says:

"I would go up there to the baseball exchange or whatever they call it, where they bet on baseball as high as a thousand dollars and bet whoever came to bet with me."

Q. You go down to this place together (referring to his brother, the plaintiff) and bet on baseball?

A. Not necessarily. Often my brother is not there and often I am not there. Often we cannot get off together.

The defendant testifies that he knew these brothers "only and absolutely in a gambling way", and further:

Q. What gambling proposition do they operate?

A. Both of these gentlemen are known as the biggest baseball gamblers in New Orleans.

Q. The largest operators in New Orleans?

A. The largest operators in New Orleans; they bet all the way from $400 to $5,000 or more, as Mr. Bacher admitted on the stand. They will stand in the poolroom and say, "Come on", and bet eight, nine, or ten or fifteen people.

\* \* \* \* \*

A. These two men in particular would sit in the room, alongside of a little square table, and there is

370

where the big operators would play and sit around one particular place; and I every day, for two or three weeks, would bet those two particular men. * * *.

He further states that Inspector of Police Reynolds closed up one place on account of fraudulent practices, "a poolroom in Exchange Alley in which Christian Bacher operated in at that particular time and bet numerous people on baseball games."

Recalled as a witness, Christian Bacher testified:

A. . I will tell you what our record on baseball games is: Everyone that bets us put their money up, puts the cash in our hands and we hold the stakes.

Q. In other words you are your own stakeholders?

A. We hold not only our own stakes, but we hold other stakes. We have a record of being the squarest gamblers that were operating in Royal street.

* * * * *

Q. Did you have any place in Exchange Alley that they (the police) closed because you received advance information?

A. The only thing I know is that I would walk in there and they would come around there and ask me if I would take their bets, and ask me the odds; and if they wanted to bet me $100 they would come to me and hand me $100, and afterwards we would pay the bet at the office if we lost, or if not we would go off with the money.

The evidence thus establishes beyond all doubt that the parties were engaged either in operating or in betting in poolrooms; and whether the transaction in question constitutes the one offense or the other is immaterial, since

both are equally reprobated by the statute as interpreted by the Supreme Court.

The suit was properly dismissed and the judgment is accordingly affirmed.

Affirmed.

Opinion and decree, June 11th, 1917.

Rehearing refused, July 17th, 1917.

Writ denied, November 2nd, 1917.